# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Black Samsung cellular telephone<br>IMEI: 3535 7462 4010 879 | ) ) ) ) ) ) Case No. '21 MJ01718 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(i) | Alien Smuggling |
| 8 U.S.C. § 1324(a)(1)(A)(v)(I) | Conspiracy to Commit Alien Smuggling |
| 8 U.S.C. § 1324(a)(1)(A)(v)(II) | Aiding or Abetting Alien Smuggling |

The application is based on these facts:

See Attached Affidavit of United States Border Patrol Agent Alexander Djokich, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Alexander Djokich*
Applicant's signature

Alexander Djokich, U.S. Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___Telephone___ *(specify reliable electronic means)*.

Date: May 3, 2021

*William V. Gallo*
Judge's signature

City and state: San Diego, CA       Hon. William V. Gallo, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

Black Samsung cellular telephone
IMEI: 3535 7462 4010 879
("**Target Device 1**")

Blue One Plus cellular telephone
IMEI: 9900 1711 3000 190
("**Target Device 2**")

**Target Device 1** and **Target Device 2** are currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector Asset Forfeiture Office, located at 311 Athey Avenue, San Ysidro, California 92173.

# ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular telephones described in Attachments A, and includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of March 24, 2021 up to, and including April 23, 2021:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, **Target Device 1** and **Target Device 2**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of 8 U.S.C. § 1324(a)(1)(A)(i) (Alien Smuggling) and 8 U.S.C. § 1324(a)(1)(A)(v)(I)/(II) (Conspiracy to Commit Alien Smuggling / Aiding or Abetting Alien Smuggling).

# AFFIDAVIT

I, Alexander Djokich, having been duly sworn, depose and state as follows:

## INTRODUCTION

1. This affidavit is submitted in support of an application for a search for **Target Device 1** and **Target Device 2**, collectively known as the "**Target Devices**" and as further described in Attachment A, to seize evidence of violations of 8 U.S.C. § 1324(a)(1)(A)(i) (Alien Smuggling) and 8 U.S.C. § 1324(a)(1)(A)(v)(I)/(II) (Conspiracy to Commit Alien Smuggling / Aiding or Abetting Alien Smuggling).

2. The Target Devices consist of:

   a. **Target Device 1** is a black Samsung cellular telephone assigned International Mobile Equipment (IMEI) number 3535 7462 4010 879.

   b. **Target Device 2** is a blue One Plus cellular telephone assigned International Mobile Equipment (IMEI) number 9900 1711 3000 190.

3. The requested warrants relate to the investigation of Salvador SANCHEZ-Garcia ("SANCHEZ"), who is currently charged via complaint in the Southern District of California case no. 21-mj-01437-BLM with a violation of 8 U.S.C. § 1326 (Attempted Entry After Deportation). The **Target Devices** are currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector Asset Forfeiture Office, located at 311 Athey Avenue, San Ysidro, California 92173.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. Because this affidavit is made for the limited purpose of articulating probable cause in support of the instant application, I have not included each and every fact that I know about the current investigation. Rather, I have only included those facts necessary to articulate probable cause.

//

# TRAINING AND EXPERIENCE

5.  I have been employed as a Border Patrol Agent with U.S. Customs and Border Protection, United Sates Border Patrol (USBP) since September 2006, and I am currently assigned to the Imperial Beach Border Patrol (IMB) Station's Targeted Enforcement Unit. In 2006, I graduated from the basic Border Patrol Training Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. During my tenure as an Agent with USBP, I have participated in the investigations of a number of criminal smuggling organizations, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants and the indictments of persons for alien and narcotics smuggling including drivers, narcotic distributers, foot guides, and load house operators.

6.  During the tenure of my employment with the USBP I have patrolled the United States/Mexico International Boundary to prevent the illegal entry of aliens and/or contraband. I have arrested individuals in violation of immigration law and other applicable federal and state laws.

7.  Since 2016, I have been assigned to USBP units that operate in plain-clothes and drive unmarked service vehicles conducting anti-smuggling assignments. My duties included developing criminal cases against illicit actors and their associates within alien smuggling organizations. I have participated in the investigation of numerous alien smuggling organizations, which has required surveillance of static and mobile targets of interest. I have performed work on open investigations, developed target files, writing administrative subpoenas and warrants, and developed leads on suspects. In addition, I have analyzed cell phone tolls and other information to identify criminal associates and alien smuggling organizations through various databases.

8.  My current duties also include conducting investigations into criminal individuals and organizations committing violations of federal law within the Southern District of California. My current duties also include preparing and submitting cases for administrative and criminal proceedings against persons involved in the inducement, transportation, and harboring of undocumented individuals into and within the United

2

States, and the utilization of illegally obtained, counterfeit, altered or genuine immigration documents by undocumented individuals to gain entry into or remain illegally within the United States.

9. Through my training and experience, I have gained working knowledge and insight into the typical workings of alien smuggling organizations. I have also gained extensive knowledge as to the normal operational habits of persons involved in alien smuggling. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have become familiar with the behavior and methods of operations of alien smugglers to avoid detection and apprehension by law enforcement officers.

10. Through the course of my career, trainings, investigations, and conversations with other law enforcement personnel, I have become aware that it is a common practice for drug and alien smugglers, to work in concert with other individuals, and to do so by utilizing cellular telephones and portable radios to maintain communications with co-conspirators in order to further their criminal activities. This is the case for any organization involved in the smuggling, trafficking, movement, or distribution of illicit commodities, whether they be human cargo, controlled substances or other goods. Typically, organizations smuggling across the border, or to the interior from the border, are in telephonic contact with co-conspirators immediately prior to, during and following the smuggling event. These communications typically consist of instructions on how/where to cross or pick up drugs, directions of travel, and locations for delivery to stash houses and/or sponsors.

11. The smuggling of undocumented individuals generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and undocumented individuals. For example, drivers and passengers responsible for transporting undocumented individuals are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the undocumented individuals at the border, at which time they receive instructions, including where to pick-up the undocumented individuals for transportation into

the United States and where to take the undocumented individuals after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Undocumented individuals are also typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after apprehension.

12. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

13. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence tending to:

   a. indicate efforts to smuggle aliens from Mexico into the United States;
   b. identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

4

    c. identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. identify travel to or presence at locations involved in the smuggling, transportation, or harboring of undocumented individuals, such as stash houses, load houses, or delivery points;

    e. identify the user of, or persons with control over or access to, the **Target Devices**; and/or

    f. place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## STATEMENT OF PROBABLE CAUSE

14. On Friday April 23, 2021, Marine Interdiction Agent (MIA) Charles H. Cason was serving as the Vessel Commander aboard U.S Customs and Border Protection vessel 412819 (M819) (hereafter referred to as "M819"). Also serving aboard M819 as crewman was U.S. Customs and Border Protection Officer (CBPO) P. Hernandez. At 1140 hours on April 23, 2021, M819 was operating in near coastal waters, just off of the San Diego coast at Point Loma transiting toward Mission Bay.

15. At approximately 1140 hours on April 23, 2021, the crew of M819 noticed what appeared to be a jet ski with two passengers, possibly in distress, at position 32 41 .49'N/ 117 16.23'W immediately next to the Point Loma kelp forest. This is an odd location for passengers to ride a jet ski because the kelp is incredibly thick in this region, and thick kelp can easily be sucked into a jet ski's impeller, causing it to overheat and shut down. Additionally, the crew of M819 observed the jet ski rapidly altered speeds from very slow (approximately 3 knots) to more rapid speeds (approximately 10 knots) for a brief instant and then immediately slow down again. This erratic speed caused the vessel to appear as if it was suffering from a mechanical problem. The crew of M819 also noted that the two jet ski passengers were not dressed like typical offshore jet skiers. Typically, when driving a jet ski offshore, people will wear a wetsuit, a life jacket, and a helmet. M819's crew noted

5

that the two jets ski passengers were both wearing shorts, and appeared to be very cold. They observed that the rear passenger was leaned forward, grasping tightly onto the driver with her head tucked tight onto his back. They observed that the driver was in a similar position, but had his elbows tucked in as if he was attempting to conserve his body heat. Based on all of these factors, MIA Cason maneuvered M819 alongside to render assistance to the jet ski passengers. As MIA Cason pulled alongside, the driver kept looking forward without acknowledging him or the vessel, despite the vessel's bow sticking out approximately 20 feet in front of him to his left side. MIA Cason used the sirens to signal for the driver's attention and the driver slowed the jet ski's speed to idle.

16. As MIA Cason matched his speed, he moved M819 alongside the jet ski and CBPO Hernandez began speaking with the two passengers. MIA Cason noticed that the driver kept looking away from him, towards the shore and the Point Loma cliffs. Each time he looked away, the driver would move his hands toward his stomach and end up steering the vessel away from M819 as well. Therefore, MIA Cason shifted M819 into neutral, went to our starboard side and tossed a line around the steering wheel of the jet ski and tied it off tightly to a cleat on M819. This caused the jet ski to be snugly tied alongside of M819, preventing drift and creating a more stable platform the jet ski passengers to board M819.

17. CBPO Hernandez and MIA Cason assisted both passengers onto M819, and MIA Cason continued to work the lines to secure the vessel while attempting to keep M819 out of the kelp forest. CBPO Hernandez contacted USBP Agent Miguel Lara via radio, who assisted him in identifying the jet ski driver as Salvador SANCHEZ-Garcia and the passenger as Iris Iveth ESCOBAR-Melara and determining that both were not legally present in the United States. CBPO Hernandez placed both passengers under arrest and M819 transported them to the dock at U.S. Coast Guard Sector San Diego, in San Diego Bay.

18. USBP Agent Miguel Lara met the vessel at the Coast Guard dock at approximately 1315 hours. Both SANCHEZ and ESCOBAR stated that they had entered the country illegally on the jet ski, and admitted that they did not have any immigration documents that would allow them to enter or remain in the United States legally. SANCHEZ stated that

he was a citizen of Mexico and ESCOBAR stated she was a citizen of El Salvador. Agent Lara placed SANCHEZ and ESCOBAR under arrest, and arranged for them to be transported to the Imperial Beach Border Patrol Station for further processing.

19. CBPO Hernandez turned over the **Target Devices** to Agent Lara, and indicated that he had located both on SANCHEZ during a search incident to his arrest.

20. During processing at the Imperial Beach Border Patrol Station, SANCHEZ was found to have been convicted on January 21, 2016 for the offense of 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(II), in Southern District of California case number 15CR1959-JLS. According to the probable cause declaration in that case, SANCHEZ, on June 18, 2015 SANCHEZ and a co-conspirator piloted a panga boat northbound from Mexico into the United States with eighteen undocumented individuals aboard. After the vessel failed to yield, a pursuit led to the capsizing of SANCHEZ's vessel, and one of the undocumented individuals drowned. SANCHEZ was sentenced to thirty-six months of imprisonment at the United States Bureau of Prisons, followed by a three-year term of supervised release. According to law enforcement records, SANCHEZ was deported from the United States on February 14, 2018, and his term of supervised release expired on January 26, 2021.

21. At the Imperial Beach Station, USBP agents Alexander Palafox and Matthew Volkening interviewed ESCOBAR, who after being advised of her consular rights stated that she had made arrangements to be smuggled into the U.S. via the ocean in exchange for $10,000. ESCOBAR identified the jet ski driver as SANCHEZ.

22. After being advised of his rights under *Miranda*, SANCHEZ told USBP agents David Turner and Malko Simeon that he knew it was illegal for him to re-enter the United States after being deported. SANCHEZ also admitted he entered illegally on a jet ski to smuggle ESCOBAR into the United States, and that he was going to get paid $1,000. SANCHEZ elaborated he was working for a smuggler known as "Cango" or "El Monkey."

23. Based upon my experience and training, consultation with other law enforcement officers experienced in alien smuggling investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names,

7

electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. Considering the above facts and my experience and training, there is probable cause to believe that the Defendant was using the **Target Devices** to communicate with others to further illegal entry into the United States. I believe that the information stored in the **Target Devices** may identify other individuals involved in alien smuggling activities.

21. Alien smuggling conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the aliens into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. Accordingly, I request permission to search the **Target Devices** for data beginning on March 24, 2021, up to and including April 23, 2021.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode," which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the devices. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all

of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, a case agent familiar with the investigation will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within 90 days of the date the warrant is signed, absent further application to this court.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25. Law enforcement has not previously attempted to obtain the evidence sought by this warrant.

## CONCLUSION

26. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of violations of 8 U.S.C. § 1324(a)(1)(A)(i) (Alien Smuggling) and 8 U.S.C. § 1324(a)(1)(A)(v)(I)/(II) (Conspiracy to Commit Alien Smuggling / Aiding or Abetting Alien Smuggling). Because the **Target Devices** were seized at the time of SANCHEZ's arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date ranger for this search is March 24, 2021, up to and including April 23, 2021.

27. Accordingly, I respectfully request that the Court issue a warrant authorizing law enforcement officers to search the items described in Attachment A, and to seize the items listed in Attachment B, using the above-described methodology.

I declare under penalty of perjury that the foregoing is true and correct.

*Alexander Djokich*
Alexander Djokich
Agent, U.S. Border Patrol

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this _3_ day of May 2021.

*William V. Gallo*
Honorable WILLIAM V. GALLO
United States Magistrate Judge

10